UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SARETTA DENISE WILLIAMS
o/b/o A.D.C. III, a minor,

     Plaintiff,

v.                              Case No.:  6:22-cv-00960-KCD

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

## ORDER

Plaintiff Saretta Denise Williams sues under 42 U.S.C. § 1383(c)(3) on behalf of her minor child (Claimant) to review the Commissioner of Social Security's decision denying his application for supplemental security income. (Doc. 1.)[1] For the reasons below, the Commissioner is affirmed.

## I. BACKGROUND

In July 2019, Williams filed an application for social security benefits on behalf of Claimant, alleging he was disabled due to a behavior disorder, ADHD, and slow learning. (Tr. 152–61, 191.) Claimant was 8-years old on the date the application was filed. (Tr. 11, 152.) The Commissioner denied the application

---

[1] Unless otherwise indicated, all internal quotation marks, citations, and alterations have been omitted in this and later citations.

both initially and upon reconsideration. (Tr. 79–85, 89–100.) Williams then requested further administrative review. (Tr. 101–07.) A hearing was held before the assigned administrative law judge (ALJ), during which Claimant, who was represented by an attorney, and Williams both testified. (Tr. 29–53.)

Following the hearing, the ALJ issued an unfavorable decision finding Claimant not disabled. (Tr. 7–28.) A three-step sequential process is used to determine whether a child is disabled. 20 C.F.R. § 416.924. At the first step, the Commissioner must determine whether the claimant is engaging in substantial gainful activity; if so, the claim is denied. *Id.* § 416.924(b). At the second step, the Commissioner must determine whether the claimant has a severe impairment or combination of impairments; if the claimant does not have any severe impairments, the claim is denied. *Id.* § 416.924(c). At the third and final step, the Commissioner must determine whether the claimant's impairments meet, medically equal, or functionally equal the listings. *Id.* § 416.924(d). "The Listing of Impairments describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002). If the claimant does not have an impairment that satisfies the Listings, his claim must be denied. 20 C.F.R. § 416.924(d)(2).

Here, the ALJ determined that Claimant had the following severe impairments: "attention definition [*sic*] hyperactivity disorder and oppositional

defiant disorder." (Tr. 11.) Notwithstanding these noted impairments, the ALJ found that they did not meet, medically equal, or functionally equal the listings. (Tr. 12.) In doing so, the ALJ opined that Claimant had:

- less than a marked limitation in acquiring and using information;

- less than a marked limitation in attending and completing tasks;

- less than a marked limitation in interacting and relating with others;

- no limitation in moving about and manipulating objects;

- less than a marked limitation in the ability to care for himself/herself; and

- less than a marked limitation in health and physical well-being.

(Tr. 13.) Accordingly, the ALJ found Claimant not disabled since the date his application was filed. (Tr. 24.)

## II. LEGAL STANDARD

Review of the Commissioner's (and, by extension, the ALJ's) decision denying benefits is limited to whether substantial evidence supports the factual findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The "threshold for such evidentiary sufficiency is not high." *Id*. It is more than a mere scintilla but less than a preponderance. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

3

When determining whether the decision is supported by substantial evidence, the court must view the record as a whole considering evidence favorable and unfavorable to the Commissioner. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. And even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

## III. DISCUSSION

On appeal, Williams argues the ALJ erred in the step three analysis of whether Claimant's impairments functionally equals the limitations specified in the listings. (Doc. 20.)

In determining whether an impairment or combination of impairments "functionally equals the severity" of a listed impairment, the ALJ must consider six major domains of life: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 926a(b)(1). The claimant must establish that he suffers from an "extreme" limitation in one of the domains, or "marked" limitations in two of the domains. *Id.* § 926a(d). A limitation is "marked" if the impairment "interferes seriously with [the claimant's] ability to independently

4

initiate, sustain, or complete activities." *Id.* § 926a(e)(2)(i). A "marked" limitation is "more than moderate but less than extreme." *Id.* A limitation is "extreme" if the impairment "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." *Id.* § 926a(e)(3)(i). An "extreme" limitation is "more than marked." *Id.*

Turning back to this case, Williams argues the ALJ's finding of less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others is not supported by substantial evidence. (Doc. 20 at 10–22.) The Commissioner contends there is no error. (Doc. 21 at 3–12.)

### i. Acquiring and Using Information

In the domain of "acquiring and using information," the ALJ considers how well a child acquires or learns information, and how well he uses the information he has learned. 20 C.F.R. § 416.926a(g); SSR 09-3P, 2009 WL 396025, at *2 (Feb. 17, 2009) ("In the domain of 'Acquiring and using information,' we consider a child's ability to learn information and to think about and use the information."). A school-aged child (age 6 to 12):

> should be able to learn to read, write, and do math, and discuss history and science. [He] will need to use these skills in academic situations to demonstrate what [he] ha[s] learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class

discussions. [He] will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). [He] should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [his] own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).

Because much of a school-aged child's learning takes place in the school setting, school records will often provide a significant source of information about limitations in this domain. SSR 09-3P, 2009 WL 396025, at *3. Some indicators of a limitation in this domain, provided that they result from a medically determinable mental or physical impairment, include poor grades or inconsistent academic performance and school records of special education services, related services, or other accommodations. *Id.* Examples of limited functioning in this domain include an inability to demonstrate understanding of words about space, size or time; difficulty recalling information recently learned in school; difficulty solving mathematical problems and computations; and difficulty communicating more than in simple sentences, with difficulty explaining what the child means. 20 C.F.R. § 416.926a(g)(3)(i)-(v).

Contrary to Williams's argument otherwise, substantial evidence supports the ALJ's conclusion that Claimant had less than a marked limitation in acquiring and using information. The ALJ recognized that Claimant had an

6

Individualized Education Plan (IEP) "and received assignments administered over several brief sessions and allowing frequent breaks." (Tr. 19.) The ALJ also recognized that Claimant was given "50% extra time to complete his assignments . . . [and] was to be placed in preferential seating and receiving assignments or tests in a small group setting." (Tr. 19; *see also* Tr. 16.) However, the ALJ noted that "[C]laimant was placed in the regular classroom setting for 80% or more of the day." (Tr. 16, 285, 322.)

The ALJ further considered teacher reports. Claimant's Exceptional Student Education (ESE) and Behavior Support teachers reported in September 2020 that Claimant had mostly "slight" problems in this domain, with "obvious" problems in only two of the ten areas, namely recalling and applying previously learned material and applying problem solving skills in class discussions. (Tr. 20, 23, 210.) Similarly, Claimant's fourth grade teachers opined that Claimant had largely "slight" problems in this domain, with "obvious" problems in reading and comprehending written material and providing organized oral explanations and adequate descriptions. (Tr. 19, 218.) The ALJ noted that "[t]hey indicated that [C]aimant attempt[ed] most problems and questions independently, but that he sometimes struggle[d] to get an answer and w[ould] ask for help or clarification. They reported that [C]laimant received additional reading support twice per week from an ESE teacher." (Tr. 19, 23, 218.)

7

In her decision, the ALJ also discussed medical evaluations and opinions. First, the ALJ considered a January 2019 psychological evaluation conducted by school psychologist Ashley Sundman-Wheat, who administered the Kaufman Test of Educational Achievement–Third Edition (KTEA-3) as part of the evaluation. (Tr. 17–18, 255–69.) The ALJ noted that although "[C]laimant displayed notable behavior concerns when presented with reading comprehension tasks[,] . . . most assessments other than the reading comprehension subtest were completed with good effort by [C]laimant when provided with verbal encouragement." (Tr. 17, 260.) Dr. Sundman-Wheat noted that due to Claimant's refusal behaviors, the reading comprehension subtest was stopped and therefore "may represent an underestimate of his skills." (Tr. 260.) Nonetheless, Dr. Sundman-Wheat reported that Claimant "performed within the Average range on the Reading Comprehension subtest despite the behavioral difficulties and refusal." (Tr. 262.) The ALJ also noted that Claimant's "math skills were consistent with children his age in the normative sample (average range)" although "[h]is Nonsense Word Decoding skills fell below expected levels, indicating that that [sic] [C]laimant may have weakness in some foundational decoding skills that may reduce his frustration tolerance for reading connected text." (Tr. 18, 262.)

Second, the ALJ considered a July 2020 consultative examination with Magaly Delgado, Psy.D. (Tr. 18, 354–59.) It was reported that Claimant

attended a regular education classroom with pull-out services three times per week and had earned As and Bs in the previous school year. (Tr. 18, 354.) He had not required any speech therapy. (Tr. 18, 355.) Claimant denied difficulty focusing in class, while Williams reported that Claimant's reading skills were nearly at grade level, his math skills were "great," and his spelling and writing skills were "good." (Tr. 18, 355.) The mental status examination revealed that Claimant had normal speech, normal receptive and expressive language skills, logical and goal-directed thought processes, appropriate thought content, adequate attention and concentration, and average range intelligence. (Tr. 18, 356.) From this, the ALJ noted that Claimant's "short-term memory processes appeared fair[,]" and Claimant "was able to recall one out of three words after a three-minute recall interval, and was able to recall a second word when provided a semantic cue." (Tr. 18, 536.) Claimant was also able to recite the days of the week and the months backward and repeat up to six digits forward, five digits backward, and five digits in sequential order. (Tr. 18, 356.)

In addition to the mental status examination, Dr. Delgado administered the Wechsler Intelligence Scale for Children–Fifth Edition (WISC-V) and the Wechsler Individual Achievement Test–Third Edition (WIAT-III). The ALJ noted that "[p]er the WISC-V, [C]laimant's Full Scale IQ score was 93, falling in the average range of overall intellectual functioning when compared to his same-age peers." (Tr. 19, 357.) The ALJ also considered the results of the

9

WIAT-III, noting that Claimant's "composite reading, mathematics, and written expression scores were in the Average and Below Average ranges, which [sic] compared to his same-age peers." (Tr. 18, 359.)

Third, the ALJ considered the opinion of Lynda Christie, MACC, CSLP, whose speech and language evaluation revealed that Claimant's speech and language were within normal limits. (Tr. 19, 361–67.) Lastly, the ALJ considered and adopted the findings of the State agency medical consultants, who opined that Claimant had less than marked limitations in the domain of acquiring and using information. (Tr. 22, 60, 73.) The ALJ found their opinions persuasive noting they were consistent with Claimant's educational and medical records as discussed above. (Tr. 22.)

In addition to school records and medical evaluations, the ALJ considered Williams's testimony that "[C]laimant was on the A/B Honor Roll [and] . . . his academic performance [wa]s noted to be good." These results were confirmed by Claimant, who testified that he was doing well in school, attended regular class, and was "good in math." (Tr. 15, 35–36, 50.) It was also reported that Claimant played video games and was part of a school's running club. (Tr. 12, 14, 18, 38, 197–98, 356); *see Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin.*, 783 F.3d 847, 852 (11th Cir. 2015) (finding substantial evidence supported the ALJ's finding of less than marked limitations in acquiring and using information where the claimant "played video games, used a computer, and

10

had played organized football[,]" had been treated only conservatively with medication, and although had academic difficulties, "he was making progress in some areas").

Williams argues the ALJ erred in assessing this domain by relying "on selectively chosen evidence and fail[ing] to explain her reasoning." (Doc. 20 at 13.) According to Williams, "the ALJ only discusse[d] this domain in any detail as it related to the opinion forms from [Claimant's] fourth grade teachers[,]" and points to evidence which purportedly supported greater limitations. (*Id.* at 14.) The Court is unpersuaded. Comparing the record to the ALJ's decision, it is apparent she discussed all the relevant evidence throughout her decision. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses[.]"). Moreover, an ALJ is not required to cite every piece of evidence as long as her decision demonstrates consideration of the record as a whole. The Court is satisfied this standard was met here. *See Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1326 (11th Cir. 2021).

Finally, to the extent Williams argues the ALJ erred by combining the analysis of this domain with the domain of attending and completing tasks, this does not constitute reversible error where the ALJ made distinct findings as to both domains and her decision reflects consideration of the entire record,

allowing for meaningful judicial review. *See Light o/b/o K.G.L. v. Kijakazi*, No. 3:21-cv-00987, 2022 WL 3723982, at *4 (M.D. Pa. Aug. 29, 2022) ("Although the ALJ did not individually address each functional domain in a separate paragraph, an ALJ is not required to use particular language or adhere to a particular format in conducting the analysis."); *see also Span ex rel. R.C. v. Barnhart*, No. CIV.A.02-cv-7399, 2004 WL 1535768, at *9 (E.D. Pa. May 21, 2004).

In sum, substantial evidence supports the ALJ's conclusion that Claimant suffered from less than marked limitations in the domain of acquiring and using information. *See Parks ex rel. D.P.*, 783 F.3d at 852 (affirming the ALJ's finding of less than marked limitations even though the evidence showed that the claimant "suffer[ed] from some limitation in the area of acquiring and using information and require[d] support in the academic sphere").

### ii. Attending and Completing Tasks

In the domain of "attending and completing tasks," the ALJ considers how well a child can focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities, and how easily he changes activities. 20 C.F.R. § 416.926a(h). A school-aged child (age 6 to 12):

12

should be able to focus [his] attention in a variety of situations in order to follow directions, remember and organize [his] school materials, and complete classroom and homework assignments. [He] should be able to concentrate on details and not make careless mistakes in [his] work (beyond what would be expected in other children [his] age who do not have impairments). [He] should be able to change [his] activities or routines without distracting [him]self or others, and stay on task and in place when appropriate. [He] should be able to sustain [his] attention well enough to participate in group sports, read by [him]self, and complete family chores. [He] should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

*Id.* § 416.926a(h)(2)(iv). Examples of limited functioning in this domain include being easily startled, distracted, or overreactive to sounds, sights, movements, or touch; slow to focus on, or fail to complete activities of interest; repeatedly becoming sidetracked from activities or frequently interrupting others; being easily frustrated and giving up on tasks, including ones capable of completing; and requiring extra supervision to keep engaged in an activity. *Id.* § 416.926a(h)(3).

Substantial evidence also supports the ALJ's finding that Claimant had less than a marked limitation in this domain. As noted, the ALJ recognized that Claimant required extra time to complete assignments, was placed in preferential seating, and received assignments or tests in a small group setting. (Tr. 19.) The ALJ also acknowledged that Claimant did not always

13

complete school assignments. (Tr. 19.) However, based on Claimant's educational records, the ALJ found that Claimant's "difficulty completing assignments [was] primarily related to his poor behavior and not attention difficulties." (Tr. 19.) Indeed, as the ALJ noted, Williams testified that Claimant was "great, as far as education wise . . . his grades are great" and that he was "always on the A-B Honor Roll." (Tr. 19, 50.) The ALJ also noted Williams's report that Claimant "will do his chores, but he needs reminders." (Tr. 19; *see also* Tr. 356 (noting that Claimant completed chores including taking out the trash, vacuuming, and keeping up with his bedroom).)

Additionally, the ALJ considered teacher reports, including Claimant's ESE teachers, who opined that Claimant had no problems attending and completing tasks, and Claimant's fourth-grade teachers who reported no problems or "slight" problems in a few areas. (Tr. 20, 211, 219.) Claimant's fourth grade teachers further reported that Claimant "is independent in completing work, but often rushes or becomes distracted" and that Claimant "does respond well to redirection." (Tr. 219.)

The ALJ also considered Claimant's treatment history, finding that "[a]s to [C]laimant's alleged difficulties with completing tasks and staying on focus, [C]laimant ha[d] not been prescribed any medication for this impairment." (Tr. 21, 35, 37–38, 46, 196, 355.)

Next, the ALJ cited to Dr. Delgado's consultative examination, noting that Claimant's "attention and concentration were within normal limits." (Tr. 21, 356.) The ALJ also considered the speech and language evaluation conducted by Ms. Christie, revealing that Claimant's speech and language were within normal limits. (Tr. 21–22, 361–67.) Ms. Christie also reported that Claimant's attending skills, level of activity, social interaction, response rate, cooperation, and emotional regulation were all within normal limits. (Tr. 19, 361–62.)

Lastly, the ALJ considered and found persuasive the August 2020 and April 2021 opinions of the State agency medical consultants who found that Claimant had less than marked limitations in his ability to attend and complete tasks. (Tr. 22, 60, 74.)

As with the previous domain, Williams points to evidence in the record which purportedly supports "at least marked limitations" in this domain. (Doc. 20 at 16–18.) However, the ALJ thoroughly evaluated the entire record, and her conclusion that Claimant had less than marked limitations is supported by substantial evidence. *See Dunlop v. Comm'r of Soc. Sec.*, 518 F. App'x 691, 693 (11th Cir. 2013) ("Regardless of the evidence that might suggest that [the claimant's] impairments were more severe than the ALJ concluded, the record as a whole contains sufficient evidence for a reasonable person to accept the ALJ's conclusion that [the claimant's] impairments did not meet,

medically equal, or functionally equal a listed impairment."). Accordingly, the Court finds no reversible error in the ALJ's assessment of this domain.

### iii.  Interacting and Relating with Others

In the domain of "interacting and relating with others," the ALJ considers how well a child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). A school-aged child (age 6 to 12):

> should be able to develop more lasting friendships with children who are [his] age. [He] should begin to understand how to work in groups to create projects and solve problems. [He] should have an increasing ability to understand another's point of view and to tolerate differences. [He] should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

*Id.* § 416.926a(i)(2)(iv). In contrast, a child with an impairment might have no close friends his age, or have difficulty cooperating with others, playing games or sports with rules, or communicating with others. SSR 09-5P, 2009 WL 396026, at *7 (Feb. 17, 2009).

As above, substantial evidence supports the ALJ's finding that Claimant had less than marked limitations in this area. The ALJ acknowledged that in second grade Claimant had received multiple out-of-school suspensions for

aggressive and distractive behavior. (Tr. 20.) However, the ALJ noted that Claimant's classroom behavior had improved between the second and fourth grades, "likely based on [C]laimant's behavioral plan being increased to a higher level and [C]laimant transferring to a new school." (Tr. 12; *see also* Tr. 20.)

In so finding, the ALJ considered reports from Claimant's fourth grade teachers who said he had no problems in eight of the thirteen areas under this domain, and only "a slight problem playing cooperatively with other children, seeking attention appropriately, introducing and maintaining [] relevant and appropriate topics of conversation, taking turns in conversation, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation." (Tr. 20, 220.) They further reported that Claimant "g[ot] along well with his peers[,]" and that "[d]uring class discussions, he sometimes blurt[ed] or share[d] off topic information[,]" but "ha[d] not been removed from the classroom." (Tr. 21, 220.) Based on observations during social skills time, Claimant's ESE teachers also reported that no problems were observed in this domain and that Claimant was "able to carry on a conversation where he expresse[d] his concerns of 4th grade." (Tr. 20, 212–13.) They indicated that as familiar listeners, they understood almost all of Claimant's speech whether the topic was known or unknown. (Tr. 213.) They further reported that Claimant "was wonderful to have in class[,]" and while there

were "some academic gaps as indicated in his IEP[,]" he was "a hard worker who want[ed] to do well." (Tr. 216.)

In her decision, the ALJ considered Claimant's most recent IEP describing Claimant "as an enjoyable student who is personable and shows care and concern for others." (Tr. 16, 318.) It was reported that Claimant could "be helpful with adults and peers, and [wa]s often polite to others." (Tr. 318.) The ALJ further noted that "during social group, [C]laimant was often a peacemaker and a problem solver when a conflict arose" and was "able to stay calm, compliant, and respectful." (Tr. 16, 318.) Claimant "began the year with exemplary behavior, adhering to all school and classroom expectation, and acted as a role model to others." (Tr. 16, 319.) While Claimant's behavior declined slightly as the year progressed, it was noted that "his behavior had improved significantly from what was documented from his previous school." (Tr. 16, 319.)

In addition to school records, the ALJ considered Williams's reports that Claimant had "no problem with friends or making them[,]" and that his impairments did not affect his behavior with other people. (Tr. 14, 98, 205.) She also reported that Claimant was part of a school running club. (Tr. 197.) At the hearing, Williams testified that Claimant was "really good with his little brother[,]" and Claimant testified that he had friends and played video games

18

and spent time outside with his friends, playing football and riding bikes. (Tr. 15, 38, 48; *see also* Tr. 22, 356.)

The ALJ also discussed medical opinions and evaluations, including Ms. Christie's report that Claimant's speech and language, as well as social interaction, response rate, cooperation, and emotional regulation were within normal limits. (Tr. 19, 22, 361–67.) The ALJ noted that during Dr. Delgado's consultative examination, when Claimant was between third and fourth grade, Williams "reported that [C]laimant's behavior had improved at his new school." (Tr. 21, 354.) Dr. Delgado observed Claimant to be restless at times, but cooperative, and with normal speech. (Tr. 21, 356–59.) Finally, the ALJ considered the opinions of the State agency medical consultants, who opined that Claimant had less than marked limitations in interacting and relating with others. (Tr. 22, 60, 74.)

Like above, Williams challenges the ALJ's assessment. (Doc. 20 at 18–21.) First, Williams argues the ALJ erred by "misunderstand[ing] improvement, with different environment" and failing to properly consider the effect of Claimant's structured and supportive setting. (*Id.* at 19–20.) While Williams correctly notes that the ALJ must "consider [Claimant's] need for a structured setting and the degree of limitation in functioning [he] ha[s] or would have outside the structured setting", *see* 20 C.F.R. § 416.924a(b)(5)(iv)(C), the ALJ properly assessed Claimant's functional

19

capacity both inside and outside structured settings. Indeed, in determining Claimant's functional equivalence, the ALJ recognized that she was required to evaluate the "whole child" "by considering how [C]laimant functions at home, at school, and in the community." (Tr. 13.) She explained that she considered "all of the relevant evidence in the case record[,]" including "objective medical evidence and other relevant evidence from medical sources[,] information from other sources, such as school teachers, family members, or friends[,]" Claimant's own statements and statements from his caregivers, "and any other relevant evidence in the case record, including how [C]laimant functions over time and in all settings (i.e., at home, at school, and in the community)." (Tr. 13.)

Next, Williams argues that Claimant's "problems still exist" and that although the ALJ noted improvement "to the point where he had essentially no limitations[,]" Claimant still received an IEP in grade three. (Doc. 20 at 20–21.) The Court is again unconvinced. The ALJ thoroughly discussed Claimant's IEP and evaluations and properly concluded that "when considering that [C]laimant's improvement in behavior between second grade and fourth grade, the record is only consistent with a less than marked limitations in this domain." (*See* Tr. 16–17, 19, 21.) Moreover, the ALJ's decision is not subject to reversal where, as here, it is supported by substantial evidence. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) ("[W]e do not reverse the

20

Secretary even if this court, sitting as a finder of fact, would have reached a contrary result; even if we find that the evidence preponderates against the secretary's decision, we must affirm if the decision is supported by substantial evidence."); *Dunlop*, 518 F. App'x at 693 ("[T]he existence of evidence that is arguably inconsistent with the ALJ's conclusion is not grounds for reversal.").

Finally, Williams argues that "later records and opinions occurred during the COVID-19 pandemic[,]" and "[i]t is unclear how much these teachers even saw [Claimant] during this time." (Doc. 20 at 21.) But contrary to Williams's argument, the ALJ considered teacher reports from Claimant's 2020-21 school year, including Claimant's ESE teachers who reported seeing Claimant three times a week, ninety minutes a week, and his fourth-grade teachers, who reported seeing him "Monday-Friday for 6 weeks." (Tr. 209, 217.)

In sum, in evaluating Claimant's functional domains, the ALJ considered Claimant's and Williams's testimonies, school records and reports, and medical evaluations, and properly cited to evidence demonstrating improvement and supporting less than marked limitations. To the extent Williams asks the Court to re-weigh the record or make new factual findings, the Court may not invade the ALJ's province as a finder of fact in disability proceedings. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) ("We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner.").

For the reasons above, the Court finds that substantial evidence supports the ALJ's determination that Claimant's limitations do not rise to the level of being marked. The Court thus **AFFIRMS** the Commissioner's decision and directs the Clerk to enter judgment for the Commissioner and against Saretta Denise Williams and close the file.

**ENTERED** in Fort Myers, Florida on April 20, 2023.

Kyle C. Dudek
United States Magistrate Judge

Copies: All Parties of Record